# UNITED STATES AIR FORCE
# COURT OF CRIMINAL APPEALS

——————————

### No. ACM 40607 (f rev)

——————————

### UNITED STATES
*Appellee*

v.

### Cody L. KINDRED
Airman (E-2), U.S. Air Force, *Appellant*

——————————

Appeal from the United States Air Force Trial Judiciary

Decided 26 May 2026

——————————

*Military Judge*: Matthew P. Stoffel.

*Sentence*: Sentence adjudged 28 October 2023 by GCM convened at Luke Air Force Base, Arizona. Sentence entered by military judge on 29 December 2023: Dishonorable discharge, confinement for 20 years and 3 months, forfeiture of all pay and allowances, and reduction to E-1.

*For Appellant*: Major Heather M. Bruha, USAF; Major Trevor N. Ward, USAF; Dwight H. Sullivan, Esquire.

*For Appellee*: Colonel G. Matt Osborn, USAF; Lieutenant Colonel Thomas J. Alford, USAF; Lieutenant Colonel J. Pete Ferrell; Lieutenant Colonel Jenny A. Liabenow, USAF; Major Vanessa Bairos, USAF; Major Tyler L. Washburn, USAF; Mary Ellen Payne, Esquire.

Before JOHNSON, GRUEN, and MCCALL, *Appellate Military Judges*.

Chief Judge JOHNSON delivered the opinion of the court, in which Senior Judge GRUEN and Judge MCCALL joined.

——————————

**This is an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 30.4.**

——————————

JOHNSON, Chief Judge:

A general court-martial composed of officer and enlisted members convicted Appellant, contrary to his pleas, of one specification of wrongfully communicating a threat, in violation of Article 115, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 915; one specification of rape and two specifications of sexual assault, in violation of Article 120, UCMJ, 10 U.S.C. § 920;[1] one specification of kidnapping, in violation of Article 125, UCMJ, 10 U.S.C. § 925; one specification of assault consummated by a battery, in violation of Article 128, UCMJ, 10 U.S.C. § 928; six specifications of domestic violence, in violation of Article 128b, UCMJ, 10 U.S.C. § 928b; and one specification of obstructing justice, in violation of Article 131b, UCMJ, 10 U.S.C. § 931b.[2,3] Appellant elected sentencing by the military judge, who sentenced Appellant to a dishonorable discharge, confinement for 20 years and 3 months, forfeiture of all pay and allowances, and reduction to the grade of E-1. The convening authority took no action on the findings or sentence.

Appellant raised ten assignments of error, seven of which alleged that particular findings of guilty are factually insufficient, and as to one charge and specification also legally insufficient.[4] For purposes of our analysis, we have consolidated Appellant's arguments into four issues: (1) whether the findings of guilty are legally and factually sufficient;[5] (2) whether the special trial

---

[1] One of the specifications of sexual assault was a lesser-included offense of a charged specification of rape.

[2] Unless otherwise noted, all references in this opinion to the UCMJ, Rules for Courts-Martial, and Military Rules of Evidence (Mil. R. Evid.) are to the *Manual for Courts-Martial, United States* (2019 ed.).

[3] The court-martial found Appellant not guilty of two specifications of rape, three specifications of domestic violence, and one specification of obstructing justice in violation of Articles 120, 128b, and 131b, UCMJ, respectively.

[4] Appellant personally raises three of these assignments of error alleging factual insufficiency pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982).

[5] Appellant's fourth assignment of error asserts the findings of guilty as to Charge III and its Specification, alleging kidnapping of AS, is legally and factually insufficient. Because we set aside these findings on other grounds, we do not address Appellant's legal and factual sufficiency argument as to kidnapping. Appellant's ninth assignment of error, raised pursuant to *Grostefon*, 12 M.J. at 435, asserts the finding of guilty as to Specification 9 of Charge V is factually insufficient. The specification alleges Appellant committed domestic violence against DW by committing the underlying violent offense of assault consummated by a battery, specifically by striking her face with his hand, at or near Hill Air Force Base, Utah, on or about 20 December 2022. We have carefully considered Appellant's arguments and find they do not require discussion or relief. *See United States v. Matias*, 25 M.J. 356, 361 (C.M.A. 1987).

counsel's (STC's) closing argument was improper and warrants relief; (3) whether Appellant is entitled to relief due to post-trial delay; and (4) whether Appellant's convictions and sentence should be set aside because Appellant was entitled to a unanimous verdict.

On 24 February 2026, we issued our initial opinion in this case. *United States v. Kindred*, No. ACM 40607 (f rev), 2026 CCA LEXIS 87 (A.F. Ct. Crim. App. 24 Feb. 2026) (unpub. op.). We set aside the findings of guilty as to Charge III and its Specification and Charge IV and its Specification; dismissed Charge III and its Specification and Charge IV and its Specification; affirmed the remaining findings of guilty; and reassessed the sentence. *Id.* at *78. On 19 March 2026, Appellant requested reconsideration en banc of the court's decision, but no judge requested a vote to determine whether to reconsider the opinion en banc. *See* JT. CT. CRIM. APP. R. 27. However, on 16 April 2026, the panel voted in favor of reconsideration and vacated the 24 February 2026 opinion in this case.[6]

Upon reconsideration, we address a portion of Appellant's argument in more detail, but our ultimate conclusions remain unchanged. We have carefully considered issue (4) and find it does not warrant discussion or relief. *See United States v. Matias*, 25 M.J. 356, 361 (C.M.A. 1987); *see also United States v. Anderson*, 83 M.J. 291, 302 (C.A.A.F. 2023) (holding an accused servicemember does not have a constitutional right to a unanimous court-martial verdict), *cert. denied*, 114 S. Ct. 1003 (2024). However, we find Appellant is entitled to some relief with respect to issue (2), and we take corrective action in our decretal paragraph.

# I. BACKGROUND[7]

Appellant was convicted of offenses involving three victims, all female Airmen: DW, AS, and SM. We describe the events in roughly chronological order.

## A. Appellant and DW at Osan Air Base (AB)

DW met Appellant when they were in technical school for security forces. Both were subsequently assigned to Osan AB, Republic of Korea, where DW arrived in March 2021. Approximately one month later Appellant and DW began a romantic and sexual relationship. DW testified Appellant was "really nice" to her at the beginning of the relationship, but after approximately three

---

[6] The Government moved this court to reconsider its decision to reconsider its 24 February 2026 opinion. We denied the Government's motion for reconsideration.

[7] The following background is drawn primarily from witness testimony at trial, particularly the testimony of DW, AS, and SM.

months he began showing "an aggressive side" that "progressively got . . . worse." Appellant would speak "rudely" to DW, shove her, hit her, or pull her by her hair, usually after Appellant consumed alcohol.

DW and Appellant engaged in consensual sex as part of their relationship. On one occasion Appellant tried anal sex with DW, but she told him she did not like it. As part of their sexual relationship, DW consented to Appellant putting his hands around her neck and "squeezing it a little bit" and applying "light pressure," such that DW could still breathe and speak. However, as time passed, on some occasions Appellant would "choke" her more aggressively, again generally after he had consumed alcohol. On some occasions during sex Appellant would look at DW in a "terrifying" way, strangle her so that she could not breathe, and ignore DW when she told him to stop. Appellant did not strangle DW to the point of unconsciousness, but sometimes he would strangle her, loosen his grip temporarily, and then strangle her again. During these incidents DW would sometimes cry, sometimes ask Appellant to stop, and sometimes "just let him do whatever." Appellant "hated it" when DW cried and would tell her to "shut up." Sometimes DW and Appellant would talk about Appellant's roughness with her; Appellant told DW "he was working on those kinds of issues and stuff, like, he was aware." Appellant also disapproved of DW being "too friendly" with other people, and when they were alone he would "slap" or "yell" at her for doing so, and "tell [her] what [she] did wrong."

Appellant knew the code on the door to get into DW's dormitory room when it was locked. In order to access DW's room from the hallway, Appellant had to enter the code on the exterior door between the hallway and the suite of rooms DW shared with another Airman, as well as a second door to DW's bedroom. Both doors would "beep" as they were being opened. This beeping, coupled with the doors opening and closing, would alert DW that Appellant was coming, even if she had been asleep. Sometimes Appellant would come to her room late at night, "drunk" and "really angry," and he would "either slap [her], pull [her] hair, [or] bite her." On multiple occasions, DW pretended to be asleep when Appellant entered her room drunk late at night. On those occasions, without speaking to DW or trying to wake her, Appellant penetrated her vagina with his penis while she continued to pretend to be asleep with her eyes closed. After Appellant "finish[ed]" by ejaculating on her stomach, he would clean her up, replace her clothing, and lie down next to her to sleep. At the time, DW felt it was "uncomfortable" but "really not that big of a deal" because he was her boyfriend and they "ha[d] sex all the time." On one occasion, when Appellant was attempting to penetrate DW anally, she "flinched" her body, which caused Appellant to stop momentarily as if to "mak[e] sure that [DW was] not awake." After "a couple" of these incidents had occurred, one day Appellant told DW that he "had sex with [her] while [she was] sleeping," and "it was something he

liked to do." DW pretended to have been unaware, and then told Appellant "it was okay" for him to do that.

## B. Appellant's Interaction with AS at Osan AB

In June 2021, DW shared a dormitory suite with AS. DW and AS had individual bedrooms but shared a common kitchen and bathroom. The main door to the suite and the doors to each bedroom all had separate locks on them. Like DW and Appellant, AS was also in security forces and she knew Appellant both from her work and through DW.

On 21 June 2021, after doing her laundry, AS returned to her dormitory room to find Appellant in the hallway trying to open the exterior door. AS noted Appellant smelled like alcohol and he fumbled with the lock before successfully opening it. The two of them entered the common area, and the door closed behind them. AS noticed Appellant was looking at her "weirdly" and seemed "off." Appellant then grabbed AS by the upper arms and pushed her into a corner of the room. Appellant shook AS and asked her, "Where is [DW]?" In addition to shaking AS by the arms twice, he grabbed her face. When AS told Appellant she did not know where DW was, Appellant accused her of lying. AS attempted to calm Appellant down and told him she needed to do her laundry, but Appellant continued to accuse AS of lying. When AS attempted to step past Appellant, he repeatedly stepped in front of her, "basically not letting [her] leave the room." At one point Appellant put his hand on AS's chest and asked her if she was "scared;" AS told him "[n]o," which was untrue. After approximately five to ten minutes, Appellant allowed AS to leave the room, and Appellant followed her out. AS soon encountered some on-duty security forces members in the dormitory, but she did not immediately report to them what Appellant had done.

On a later occasion, AS was with a group of Airmen off base when she encountered DW and Appellant. AS and DW hugged one another. Appellant grabbed DW by the arm and pulled her away from AS. Appellant then grabbed DW by the back of her neck and led her away from AS.

## C. Appellant's Departure from Osan AB

Appellant departed Korea in March 2022. On the morning of Appellant's departure, he and DW had an argument in DW's room, although DW later could not recall what the argument was about. Appellant and DW had both intended to "have sex" before Appellant departed. However, DW was "really upset" and "didn't really want to," and told Appellant she "d[id]n't want to have sex while [he] was angry with [her]." This "annoyed" Appellant, and they "started having sex anyways," so that Appellant would not "be mad at [her] anymore." They had vaginal intercourse with Appellant positioned behind her, with his hand on the back of her neck as she was bent over the bed. DW was

sad and she began crying. DW's crying made Appellant angry and he told her to "shut up," but she could not stop crying.

After a time, Appellant let DW get up from the bed, and she walked over to the sink in her room. DW told Appellant she "was upset because [they were] having sex while he[ was] upset with [her], and that it didn't make [her] feel good." In response, Appellant said "Oh my God, shut up." Appellant then said "shut up, let me finish at least," grabbed her, and bent her over the bed again. While DW continued to cry, Appellant then penetrated her anus with his penis until he "finish[ed]."

DW never reported any of Appellant's behavior while they were in Korea because she "loved him," because she thought their relationship was "normal," and because she considered Appellant's actions "just rough sex" and not criminal. In addition, Appellant had told her "if you're in a relationship with someone, like, you can't rape your wife, like, you can't rape your girlfriend," which "made sense to [her]" at the time.

Appellant was transferred to Luke Air Force Base (AFB), Arizona. Shortly thereafter, DW was transferred to Hill AFB, Utah. After Appellant left Korea, DW described their relationship as "like on a break," although they "still talked every single day." According to DW, after a break they were "together" for a couple of months, then had another break, then "got back together again."

**D. Appellant and SM**

SM, another security forces member, met Appellant at Luke AFB in May 2022 when they were assigned to the same flight. SM and Appellant soon began a consensual sexual relationship. Prior to 7 June 2022, Appellant and SM had consensual intercourse approximately four or five times. According to SM, these occasions did not involve anal intercourse, strangling, or slapping.

On 7 June 2022, SM brought alcohol and pizza to Appellant's dorm room for a planned "movie night" together. SM and Appellant began drinking alcohol and watching a movie, and then engaged in consensual vaginal intercourse. Later, SM went to the sink to wash her hands. Appellant approached her from behind, and when SM turned to face him Appellant suddenly slapped her face. This made SM very confused because Appellant had never done anything like that before.

Appellant returned to the bed and sat down. SM also went to the bed and sat behind Appellant. Appellant then told SM "that he likes to do things that he would do with his ex-girlfriend often and that he did not think that [SM] would enjoy those things." SM asked Appellant, "Well, how do you know that?" Appellant described what he was referring to as "rough sex." At trial, SM explained what she thought Appellant meant by "rough sex":

[M]aybe, like, light slapping on, like, you know, butt, maybe like, hair pulling, just – I don't – I guess it's just normal rough sex activity, something that's, you know, you're still getting pleasure out of. It's not supposed to hurt you. It's not supposed to scare you.

During this conversation, SM said to Appellant, "You could do anything you wanted." After she said this, Appellant turned toward SM and put his hand on her throat. SM felt it was difficult to breathe or speak, and she asked Appellant to "please stop." In response, Appellant "said something along the lines of, 'Oh, you don't want me to stop' or 'you want me to continue,'" and put his other hand on SM's throat. This "completely cut [SM's] airway off," gave her a "weird fuzzy sensation," and made her "eyes start to go black." SM then lost consciousness.

SM awoke sometime later to Appellant shaking her and yelling at her to "wake up." SM found she was lying on the bed wearing only her t-shirt; the black shorts she had been wearing had been removed. Appellant looked "scary," "mad," and "irritated." SM felt "terrified" and began crying and hyper-ventilating. She slid off the bed and sat on the floor with her back against a wall. Appellant then began hitting SM in the face "many times" as he told her to stop crying. According to SM's testimony, Appellant told her "that if [she] d[id]n't stop crying, something along the lines of, like, [she will] find out what happens." SM tried to stop crying but could not. SM testified Appellant then grabbed SM by the hair and hit her head against the wall twice, then struck her in the face "a few more times" with his hand. Appellant then dragged SM into the bathroom and told her to remove her shirt and shower. Appellant, un-clothed, got into the shower with SM and instructed her to wash her hair and entire body. While they were in the shower, "numerous times" Appellant raised his hand as if he was going to hit her again. Each time he did so SM would flinch, and when she flinched Appellant would laugh at her.

After Appellant left the bathroom, SM was able to get her phone. SM sent text messages to Senior Airman (SrA) OA, a friend who SM was living with at the time, which provided SM's location and read, "if anything happens to me this is my location" and "[t]he last known person I was with is [Appellant] from security forces." SM also used her phone to take photos of bruises on her thigh, face, and hand. After SM dried off, she got dressed, grabbed her belongings, and ran out of Appellant's room. SM ran down the stairs out of the building to her car and drove to SrA OA's off-base house. As she drove, she was able to speak with SrA OA by phone. SrA OA called the civilian police, who arrived at SrA OA's residence after SM arrived. At trial, the Government introduced po-lice body camera video and audio which depicted SM distraught and crying outside SrA OA's house when the police arrived. As SM spoke with police inside

SrA OA's house, she felt pain in her "anal region" and noticed fluid coming from there, which she believed to be semen.

SM had not asked SrA OA to call the police and she did not want to report the incident. However, she agreed to a sexual assault forensic examination at a civilian hospital.[8] The examination identified evidence of strangulation as well as injuries to SM's anus, legs, and hand. Subsequent testing of an anal swab identified DNA profiles that matched SM and Appellant.

Although SM initially did not intend to initiate a law enforcement investigation, the Air Force Office of Special Investigations (OSI) became aware of the incident and interviewed SM. SM initially did not want to cooperate with OSI, and in her first OSI interview she specifically denied Appellant was her assailant. At trial, SM explained her feelings at the time:

> I think I again hadn't even processed what happened; and in the moment, there was a lot of just emotions on whether I questioned if I – if it was my fault or like should I have done something differently because, you know, I did say the statement he could do whatever he wanted, so I just had a lot of blame on myself and also the fear of I just didn't want him to know that an investigation was starting because we still were working on the same flight together and I just was scared of what would happen if he found out.

SM met with Appellant again in his dormitory room multiple times after the 7 June 2022 incident. She also continued to exchange text messages and phone calls with Appellant until the end of June 2022.

## E. DW Makes Contact with SM

One day in the early summer of 2022, DW was at work at Hill AFB and speaking with Appellant on the phone when she received a call from the OSI detachment at Luke AFB on the same phone. When DW mentioned to Appellant she was receiving a call from OSI at Luke AFB, Appellant told her not to answer it. However, DW did take the call "because it's OSI" and because she was "genuinely curious" why they would be calling her.

During that conversation DW learned Appellant "was under investigation for something." OSI did not provide details, but did provide her with SM's

---

[8] Specifically, SM agreed to what was known in Arizona as a Violence Against Women's Act (VAWA) examination. The sexual assault nurse examiner who testified at trial explained VAWA examinations provide victims "an opportunity to have their evidence collected and their injury documented without law enforcement, and they have 90 days to determine whether they would choose to use law enforcement or not."

name. DW and SM did not know each other and neither was previously aware of Appellant's relationship with the other. The agent asked DW about her relationship with Appellant. DW responded to the effect that their relationship was really good and did not report any misconduct by Appellant, in part because she wanted to protect him.

After her conversation with OSI, DW became upset and called Appellant back. She asked Appellant what he did. Appellant denied doing anything wrong and told her SM was "lying."

Later, DW found SM on Facebook and exchanged messages with her in mid-July 2022. This exchange led to a telephone conversation between DW and SM in which they each described some of their experiences with Appellant. After this conversation DW felt "overwhelmed, hurt, betrayed, [and] scared." According to her testimony, she then called OSI back and told them "they should believe" SM, and "told them a little bit of kind of [DW's] situation with [Appellant]."

OSI set up a meeting with DW. However, before that meeting took place DW spoke with Appellant again. According to DW, Appellant told her again that SM was lying, that the investigation "wasn't even going anywhere" and it "wasn't that serious," which was "why he didn't tell [her] to begin with." After this conversation, DW decided she was not going to leave Appellant and not going to talk to OSI any more.

After her conversation with DW, SM began cooperating with the OSI investigation of Appellant.

**F. December 2022 Incident between Appellant and DW**

Between July and December 2022, DW and Appellant continued a long-distance relationship. They met in person approximately four or five times, and Appellant was not violent toward DW on those occasions.

In December 2022, DW, who was at Hill AFB, communicated with Appellant, who was at Luke AFB, about a squadron holiday party she was planning to attend. Appellant disapproved of the new leather pants DW was planning to wear. Appellant told DW to return the pants and show him the receipt to prove they were returned. DW initially refused, but eventually told Appellant she would return them. However, instead of returning them she hid them in a backpack. When Appellant asked her for the receipt, DW claimed to have lost it.

On the night after the holiday party, DW was awoken when Appellant unexpectedly knocked on her door having driven to Hill AFB from Luke AFB. DW was initially happy to see Appellant, and hugged and kissed him. However, Appellant immediately began searching DW's room for the leather pants.

When he found them, he ripped them apart and threw them in her trash. Appellant then demanded to review DW's phone, and became "really mad" and yelled at her as he blocked and deleted conversations with one of DW's acquaintances. DW testified Appellant also told DW "how easy it would be for him to kill [her]," but Appellant had said that to her on multiple prior occasions so that it seemed a "normal" part of their relationship. Eventually DW succeeded in calming Appellant down and they went to sleep.

The following day, at DW's suggestion, she drove them to the gym together in her car. That evening, they went to an off-base bowling alley where they both consumed beer. At the bowling alley they began conversing with another couple. The couple told Appellant and DW about a nearby bar. Appellant drove DW's car to the bar where he and DW played pool, socialized, and drank more alcohol with the other couple. Eventually they left the bar and Appellant drove them back to DW's dormitory. At trial, DW could not remember that drive or returning to her room very well, but she remembered there was tension between her and Appellant.

DW testified she only had "snippets" of memory of what happened that night at the dormitory. DW remembered Appellant "putting [DW] on [her] knees and ripping out [her] eyelash extensions." DW remembered standing in front of the mirror in her bathroom, crying, while Appellant wiped blood off her bleeding face. DW also remembered begging Appellant to allow her to get her phone from her car because she did not want to be late for work the next morning and she needed to set the alarm. Appellant was "really, really upset" and initially refused and told her to lie in the bed, but eventually he went with her to retrieve her phone from the car.

At trial, three other residents of DW's dormitory testified to hearing a loud dispute coming from the hallway and DW's room that night. The witnesses described one of the voices as male, which the witnesses described as "angry" and "threatening," and the other as female, which the witnesses described as "distressed," "very distraught," "upset," and "threatened." One witness described the female as crying and saying "no" repeatedly.[9]

The next morning, DW went to her squadron for training while Appellant remained in her room. When DW arrived, her supervisors took her aside and asked her about bruising on her face. DW initially resisted telling them what had happened. While her supervisors intermittently attempted to question

---

[9] None of the neighbors reported the dispute to law enforcement or other authorities. However, after the dispute had quieted down, one of the neighbors left a muffin and a drink outside DW's door with a note that read, *inter alia*, "don't know what happened a few hours ago but I hope you guys work things out."

her, DW texted Appellant to warn him to leave the room because she "loved him" and "didn't want him to get in trouble." Eventually DW's supervisors succeeded in getting DW to tell them Appellant's name. When members of the unit went to DW's room, Appellant had already departed. However, they found a bloodstained blanket and Appellant's wallet in the room and retrieved video from a security camera in the hallway outside DW's room. Subsequent consent searches of DW's room found a bloodstained jacket and tank top, false eyelashes that had been removed, and the ripped leather pants.

Appellant had departed Hill AFB but was still in the local area. Appellant's first sergeant at Luke AFB called Appellant and ordered him to proceed to the visitor center at Hill AFB. Appellant complied and was apprehended by law enforcement when he arrived. Appellant remained in pretrial confinement until his court-martial.

At some point after DW went to her squadron and before Appellant was apprehended, DW spoke with Appellant and Appellant's mother on a joint phone call. Appellant and Appellant's mother encouraged DW to agree to a story that DW received her facial bruises from a supposed altercation she had with a woman at the bar the prior night. When a security forces investigator interviewed Appellant shortly after his apprehension, Appellant provided a version of this explanation.

In the meantime, DW had been taken to the on-base medical clinic to have her injuries examined. The physician's assistant who examined DW referred her to an off-base emergency room because DW reported a worsening headache during the examination. DW's examinations at the clinic and emergency room, as well as photographs taken by OSI agents to document injuries, disclosed bruising on her face, eyes, ears, right arm, and thighs, as well as a concussion.

**G. Appellant's Convictions**

Ultimately, Appellant was convicted of 13 offenses.

With respect to SM, Appellant was convicted of one specification of communicating a threat to injure her by hitting her in violation of Article 115, UCMJ; one specification of rape by penetrating her anus with his penis by first rendering her unconscious by strangling her in violation of Article 120, UCMJ; and four specifications of domestic violence by strangling her with his hands, by biting her hand, by raising his hand as if to strike her, and by striking her on the face with his hand, in violation of Article 128b, UCMJ. All of these offenses occurred on or about 7 June 2022 at or near Luke AFB.

With respect to AS, Appellant was convicted of one specification of kidnapping in violation of Article 125, UCMJ, and one specification of assault consummated by a battery by grabbing her on the arm and face with his hands in

violation of Article 128, UCMJ. These offenses occurred on or about 21 June 2021 at or near Osan AB.

With respect to DW, Appellant was convicted of one specification of sexual assault by penetrating her anus with his penis in March 2022 at or near Osan AB, and one specification of sexual assault on divers occasions by penetrating her vulva with his penis without consent between on or about March 2021 and on or about March 2022 at Osan AB, both in violation of Article 120, UCMJ; two specifications of domestic violence by destroying a pair of pants in front of DW with the intent to intimidate her and by striking her in the face with his hand, both in December 2022 at or near Hill AFB, in violation of Article 128b, UCMJ; and one specification of obstructing justice by providing false information to law enforcement about how DW sustained injuries to her face, in December 2022 at or near Hill AFB, in violation of Article 131b, UCMJ.

## II. DISCUSSION

### A. Legal and Factual Sufficiency

#### 1. Law

We review issues of legal and factual sufficiency de novo. *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002) (citation omitted). "Our assessment of legal and factual sufficiency is limited to the evidence produced at trial." *United States v. Rodela*, 82 M.J. 521, 525 (A.F. Ct. Crim. App. 2021) (citation omitted).

"The test for legal sufficiency is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Robinson*, 77 M.J. 294, 297–98 (C.A.A.F. 2018) (citation omitted). "[T]he term 'reasonable doubt' does not mean that the evidence must be free from any conflict . . . ." *United States v. King*, 78 M.J. 218, 221 (C.A.A.F. 2019) (citation omitted). "[I]n resolving questions of legal sufficiency, we are bound to draw every reasonable inference from the evidence of record in favor of the prosecution." *United States v. Barner*, 56 M.J. 131, 134 (C.A.A.F. 2001) (citations omitted). Thus, "[t]he standard for legal sufficiency involves a very low threshold to sustain a conviction." *King*, 78 M.J. at 221 (alteration in original) (citation omitted).

We are neither required nor empowered to review the factual sufficiency of the evidence unless an appellant both (1) asserts an assignment of error and (2) shows a specific deficiency in the proof. *United States v. Harvey*, 85 M.J. 127, 130 (C.A.A.F. 2024). The current version of Article 66(d)(1)(B), UCMJ, FACTUAL SUFFICIENCY REVIEW, states:

(i) In an appeal of a finding of guilty under subsection (b), the Court may consider whether the finding is correct in fact upon a request of the accused if the accused makes a specific showing of a deficiency of proof.

(ii) After an accused has made a showing, the Court may weigh the evidence and determine controverted questions of fact subject to—

(I) appropriate deference to the fact that the trial court saw and heard the witnesses and other evidence; and

(II) appropriate deference to findings of fact entered into the record by the military judge.

(iii) If, as a result of the review conducted under clause (ii), the Court is clearly convinced that the finding of guilty was against the weight of the evidence, the Court may dismiss, set aside, or modify the finding, or affirm a lesser finding.

10 U.S.C. § 866(d)(1)(B), *Manual for Courts-Martial, United States* (2024 ed.) (2024 *MCM*).

"[T]he requirement of 'appropriate deference' when a [Court of Criminal Appeals (CCA)] 'weigh[s] the evidence and determine[s] controverted questions of fact' . . . depend[s] on the nature of the evidence at issue." *Harvey*, 85 M.J. at 130 (third and fourth alterations in original). It is within this court's discretion to determine what level of deference is appropriate. *Id*. at 131.

"[T]he quantum of proof necessary to sustain a finding of guilty during a factual sufficiency review is proof beyond a reasonable doubt, the same as the quantum of proof necessary to find an accused guilty at trial." *Id*. at 131 (internal quotation marks omitted). For this court "to be 'clearly convinced that the finding of guilty was against the weight of the evidence,' two requirements must be met." *Id*. at 132. First, we must decide that evidence, as we weigh it, "does not prove that the appellant is guilty beyond a reasonable doubt." *Id*. Second, we "must be clearly convinced of the correctness of this decision." *Id*.

The elements and applicable defenses for the convictions Appellant challenges on appeal are addressed in the respective sections of the Analysis, *infra*.

**2. Analysis**

The court-martial found Appellant guilty of a total of five charges and 13 specifications. Appellant challenges the findings of guilty as to three charges and eight specifications on the grounds of insufficiency of the evidence. We address Appellant's arguments in turn.

### a. Charge II, Specification 3 – Rape of SM by Rendering her Unconscious

In order to convict Appellant of rape as alleged in Specification 3 of Charge II, the Government was required to prove: (1) Appellant committed a sexual act upon SM by penetrating SM's anus with his penis; and (2) Appellant did so by first rendering her unconscious by strangling her with his hands. *See* 10 U.S.C. § 920(a)(4); *Manual for Courts-Martial, United States* (2019 ed.) (*MCM*), pt. IV, ¶ 60.b.(1)(d). "Sexual act" means "the penetration, however slight, of the penis into the vulva or anus or mouth." 10 U.S.C. § 920(g)(1)(A). The Government introduced evidence as to both elements. SM's testimony that she felt pain and fluid leaking from her anus after she fled Appellant's dormitory room, medical evidence of injury to SM's anus, DNA evidence from anal swabs, and all of the surrounding circumstances indicate Appellant penetrated SM's anus with his penis. In addition, before any such penetration occurred, SM testified Appellant strangled her with his hands until she was unconscious. SM's testimony was supported by medical evidence of strangulation.

Appellant does not challenge the evidence of penetration. However, he contends the Government failed to disprove beyond a reasonable doubt that the anal penetration was consensual. He presents several arguments in support of this contention, and we find Appellant has made a sufficiently "specific showing of a deficiency of proof" to enable this court to review the factual sufficiency of the findings. *See* 10 U.S.C. § 866(d)(1)(B)(i); *Harvey*, 85 M.J. at 130.

First, Appellant points to SM's testimony where she acknowledged that when asked during an OSI interview whether the anal sex was consensual, she responded, "I want to say, yes," but she was not sure because she was intoxicated and had a "spotty memory." Appellant suggests SM may have experienced an alcohol-induced fragmentary blackout, and simply could not remember engaging in consensual anal intercourse. We are not persuaded. SM provided clear testimony that Appellant strangled her until she was unconscious. Her next memory was of Appellant shaking her and yelling at her to "wake up." She described her panicked and distraught reaction to having been strangled unconscious, and Appellant's violence and threats in response. In Appellant's bathroom she took photos of her injuries and sent text messages and her location to SrA OA because she was afraid Appellant might kill her. Her testimony accounts for events from the point Appellant shook her awake until she fled from his dormitory room. At trial, the Government introduced witness testimony, the text messages, photographs, a medical report, and police body camera video and audio documenting SM's injuries and evident distress following the incident. The evidence does not suggest a reasonable possibility that Appellant and SM engaged in consensual anal sex that SM simply could not recall due to a fragmentary blackout.

SM evidently had conflicting feelings after the incident, and at points she indicated she felt some responsibility for what occurred because she had told Appellant he could "do anything [he] wanted" before he strangled her. However, we are not clearly convinced SM's comment during her OSI interview raises a reasonable doubt sufficient to overcome the evidence that Appellant penetrated her anus with his penis by first strangling her with his hands until she was unconscious.

Next, Appellant cites the evidence of Dr. PT, a doctor of nursing practice who testified as a defense expert witness in forensics. Dr. PT testified about the effects of strangulation. She stated that if the subject's blood flow to the brain is cut off, the person will begin to experience unconsciousness in about five to ten seconds. If the strangulation continues, at 14 or 15 seconds the subject can experience a seizure and loss of bladder control; at 30 seconds, loss of bowel control; and at 60 seconds, death. However, if the pressure is released, an unconscious person can regain consciousness within one or two seconds. Appellant contends that, given Dr. PT's testimony, it is unlikely that SM remained unconscious throughout the anal intercourse, and there is a real possibility the penetration was consensual.

Again, we are not clearly convinced this evidence raises a reasonable doubt regarding the elements the Government was required to prove. A fair reading of Dr. PT's direct testimony is that she was describing the effects of a complete, rather than partial, interruption of blood flow to the brain. Moreover, on cross-examination, Dr. PT acknowledged *inter alia* that a strangling victim could be unconscious for a minute or more without suffering permanent effects; that once the subject regained consciousness it "may take them a minute to refocus" and become aware of their surroundings; that a period of unconsciousness could be extended by loosening and then reapplying pressure on the subject's neck; and that it was possible for someone to be raped while they were unconscious due to strangulation. Considering the evidence as a whole, we remain persuaded Appellant strangled SM until she was unconscious, and he accomplished the anal penetration by first rendering her unconscious.

Finally, Appellant attacks the reliability of SM's testimony in general, describing her as a "singularly unreliable witness." Appellant notes SM admitted lying to OSI when they first questioned her, going as far as to specifically deny Appellant assaulted her. Appellant further cites SM's testimony admitting that at an earlier motions hearing in this case, she had testified her interactions with Appellant ended after 7 June 2022, which was not true. SM denied that this had been an intentional lie because it was what she believed based on her memory at the time, but she acknowledged the prior testimony was false. In addition, Appellant contends this court should afford no deference to the court members' assessment of SM's credibility because that assessment

was tainted by STC's improper vouching during closing argument, which we discuss further in section II.B, *infra*.

As to this last point, as discussed below, we are not persuaded the court members were materially influenced by improper vouching for SM. We find the members' in-person assessment of the reliability of SM's testimony is entitled to significant deference. As to SM's reliability more generally, to be sure she was not an ideal witness in that she admitted to lying to OSI about Appellant, and she admitted to previously testifying untruthfully. SM's denying to OSI that Appellant was responsible for her injuries was certainly not laudable, but explicable given her conflicting feelings after the incident, her feeling of partial responsibility, her initial desire to continue a relationship with Appellant notwithstanding his abuse, and the fact that OSI approached SM despite her not wanting a law enforcement investigation at that time. We acknowledge that providing false testimony, even if based on a mistaken belief at the time, certainly does not enhance a witness's credibility. Even so, we are not clearly convinced these admissions by SM materially undermine the Government's compelling evidence that on or about 7 June 2022, Appellant strangled SM into unconsciousness and then penetrated her anus with his penis.

Accordingly, we are not clearly convinced the finding of guilty as to Specification 3 of Charge II involving SM is against the weight of the evidence, and we do not find the conviction factually insufficient.

### b. Charge II, Specification 2 – Sexual Assault of DW[10]

In order to convict Appellant of sexual assault, a lesser included offense of the offense of rape charged in Specification 2 of Charge II, the Government was required to prove: (1) Appellant committed a sexual act upon DW by penetrating her anus with his penis; and (2) Appellant did so without DW's consent. *See* 10 U.S.C. § 920(b)(2)(A); *MCM*, pt. IV, ¶ 60.b.(2)(d); *see also* 10 U.S.C. § 920(g)(1)(A) (defining "sexual act" *supra*). DW testified that in March 2022, on the morning of the day Appellant departed Korea, they were having vaginal sexual intercourse in DW's room. However, DW was crying uncontrollably because Appellant was upset with her, which made Appellant angry. They stopped having sex and DW moved away from the bed. DW told Appellant she was upset because Appellant was angry at her, which "didn't make [her] feel good." Appellant told DW to "shut up" and "let [him] finish." He then grabbed DW, bent her over the bed, and penetrated her anus with his penis as she continued to cry.

---

[10] Appellant challenges this finding pursuant to *Grostefon*, 12 M.J. at 435.

Appellant does not contest that DW's testimony, if true, is factually sufficient to sustain this conviction for sexual assault. Instead, he contends DW's testimony is insufficiently reliable for multiple reasons. First, Appellant cites an admitted false statement by DW with regard to a different incident.[11] Appellant also argues DW's allegations from Korea are "stale," such that there was "no prospect of obtaining any physical evidence to either corroborate or refute her allegations," and no evidence of any statements she made concerning Appellant's misconduct at the time. Appellant cites DW's testimony that at the time she did not consider Appellant's conduct criminal and suggests "the OSI agents altered her understanding of the acts or that she changed her narrative concerning the acts to please the OSI agents." Appellant notes that when OSI first contacted DW in July 2022 as part of their investigation of the SM incident, DW described him as a "good boyfriend" and did not report any of his misconduct from Korea. Finally, Appellant notes DW voluntarily reestablished an intimate relationship with Appellant after they left Korea, in spite of the alleged abuse and being geographically separated.[12]

We find Appellant has made a sufficiently "specific showing of a deficiency of proof" to enable this court to review the factual sufficiency of the findings. *See* 10 U.S.C. § 866(d)(1)(B)(i); *Harvey*, 85 M.J. at 130. However, we do not find Appellant's arguments persuasive.

The testimony of a single witness may be sufficient to meet the Government's burden of proof "so long as the members find that the witness's testimony is relevant and is sufficiently credible." *United States v. Rodriguez-Rivera*, 63 M.J. 372, 383 (C.A.A.F. 2006) (citations omitted). Evidently the court members found DW's testimony sufficiently credible as to this offense, and so do we. Moreover, DW's testimony provides a cogent general explanation for the discrepancies Appellant cites. DW explained that throughout their time together in Korea, and even through the final incident in December 2022, DW loved Appellant and felt a desire to protect him and continue their relationship. DW also explained that she never had a long-term romantic relationship with

---

[11] Specifically, on cross-examination DW admitted she provided a memorandum to her chain of command after the 21 June 2021 incident between AS and Appellant that included false information. DW testified she did so in order to protect Appellant and downplay the seriousness of his conduct.

[12] Similar to his argument at section II.A.2.a, *supra*, Appellant contends this court should afford no deference to the court members' assessment of DW's credibility due to STC's improper vouching during closing argument. *See* section II.B, *infra*. Similar to our conclusion above, we are not persuaded the court members were materially influenced by improper vouching for DW, and we find the court members' assessment of DW's live testimony is worthy of significant deference.

a man prior to Appellant, and she considered their relationship "normal" in spite of his aggression toward her.

Accordingly, we are not clearly convinced the finding of guilty as to Specification 2 of Charge II involving DW is against the weight of the evidence, and we do not find the conviction factually insufficient.

### c. Charge II, Specification 4 – Sexual Assault of DW[13]

In order to convict Appellant of sexual assault as alleged in Specification 4 of Charge II, the Government was required to prove: (1) Appellant committed a sexual act upon DW by penetrating her vulva with his penis on divers occasions; and (2) Appellant did so without DW's consent. *See* 10 U.S.C. § 920(b)(2)(A); *MCM*, pt. IV, ¶ 60.b.(2)(d); *see also* 10 U.S.C. § 920(g)(1)(A) (defining "sexual act" *supra*).

> The term "consent" means a freely given agreement to the conduct at issue by a competent person. An expression of lack of consent through words or conduct means there is no consent. Lack of verbal or physical resistance does not constitute consent . . . . A current or previous dating or social or sexual relationship by itself . . . does not constitute consent.

10 U.S.C. § 920(g)(7)(A).

DW testified that on multiple occasions while she and Appellant were stationed at Osan AB, Appellant would enter her room late at night while she pretended to be asleep. Without attempting to wake her, Appellant penetrated her vagina with his penis while DW continued to feign sleep. On one occasion, DW "flinched" and Appellant temporarily stopped moving as if to "mak[e] sure that [DW was] not awake." Appellant later told DW he had sex with her while she was asleep, and it was something he liked to do.

As with Specification 2 of Charge II, Appellant does not contest DW's testimony, if true, is sufficient to sustain the conviction. Appellant did not attempt to obtain DW's consent on these occasions, and her lack of verbal or physical resistance—other than by pretending to be asleep—was not consent. Instead, he relies on the same arguments that DW is an insufficiently reliable witness to prove his guilt beyond a reasonable doubt. For the reasons stated in section II.A.2.*b*, *supra*, we are not clearly convinced the finding of guilty as to Specification 4 of Charge II is against the weight of the evidence, and we do not find the conviction factually insufficient.

---

[13] Appellant challenges this finding pursuant to *Grostefon*, 12 M.J. at 435.

### d. Charge V, Specification 4 – Domestic Violence against SM by Biting her Hand

In order to convict Appellant of domestic violence as alleged in Specification 4 of Charge V, the Government was required to prove: (1) Appellant committed a violent offense against SM, to wit: assault consummated by a battery by biting her hand; and (2) at the time, SM was an intimate partner of Appellant. *See* 10 U.S.C. § 928b(1); 2024 *MCM*, pt. IV, ¶ 78a.b.(1).[14] In order to establish Appellant committed an assault consummated by a battery, the Government was required to prove: (1) Appellant did bodily harm to SM by biting her hand; (2) the bodily harm was done unlawfully; and (3) the bodily harm was done with force or violence. *See* 10 U.S.C. § 928(a); 2019 *MCM*, pt. IV, ¶ 77.b.(2). "Intimate partner" includes, *inter alia*, "a person with whom one has been in a social relationship of a romantic or intimate nature." 2024 *MCM*, pt. IV, ¶ 78c.(3). "Bodily harm" means "an offensive touching of another, however slight." 2019 *MCM*, pt. IV, ¶ 77.c.(1)(a). "[A]s a general matter, consent 'can convert what might otherwise be offensive touching into nonoffensive touching . . . .'" *United States v. Johnson*, 54 M.J. 67, 69 (C.A.A.F. 2000) (quoting *United States v. Greaves*, 40 M.J. 432, 433 (C.M.A. 1994)).

"[I]t is a defense to an offense that the accused held, as a result of ignorance or mistake, an incorrect belief of the true circumstances such that, if the circumstances were as the accused believed them, the accused would not be guilty of the offense." Rule for Courts-Martial (R.C.M.) 916(j)(1). If the mistake goes to an element requiring general intent, it "must have existed in the mind of the accused and must have been reasonable under all the circumstances." *Id*. Once raised, the Government bears the burden to prove beyond a reasonable doubt that the defense does not exist. R.C.M. 916(b)(1); *see United States v. McDonald*, 78 M.J. 376, 379 (C.A.A.F. 2019).

When SM was alone in Appellant's bathroom after he forced her to shower on the night of 7 June 2022, she took a photograph of a bite-shaped bruise on her left hand. The nurse who conducted SM's sexual assault examination the following day noted the "patterned" bruise on her hand with discernible "teeth marks" in it. The nurse recorded in her report that SM told her, "When

---

[14] After the issuance of the 2019 Manual for Courts-Martial, but before the date of Appellant's Article 128b, UCMJ, offenses (7 June 2022), the President signed an executive order on 31 January 2022 which amended certain provisions of the Manual for Courts-Martial, to include a new paragraph 78a of the Uniform Code of Military Justice—Article 128b, UCMJ, *Domestic Violence*—outlining, *inter alia*, the elements of the offense and maximum punishments to be imposed. *See* Exec. Order No. 14,062, 3 C.F.R. 4763 (31 Jan. 2022). Therefore, we refer to the 2024 *MCM* when addressing this offense.

[Appellant] had one hand on my neck he took my hand and bit it," and again, "he bit my hand." At trial, SM testified she could not remember Appellant biting her hand while she was awake. The military judge provided the court members a mistake of fact instruction with regard to Specification 4 of Charge V.

Appellant does not contest that he bit SM's hand. Instead, he contends the Government failed to disprove beyond a reasonable doubt that SM either consented to the bite, or Appellant had an honest and reasonable mistake of fact that she consented to the bite. He describes the circumstances under which Appellant bit SM as "murky." Appellant cites SM's testimony that, as Appellant told SM that he enjoyed "rough sex," SM told him he "could do anything [he] wanted." Although SM testified she had no memory of Appellant biting her while she was awake, he cites SM's reported statement during the sexual assault examination that Appellant bit her while he was strangling her with one hand. He also cites SM's statement to law enforcement that she had a "spotty" memory of the night because she was "intoxicated." Appellant contends the bite could have occurred with consent at an early stage during consensual "rough sex," "before any arguable withdrawal of consent," or if without consent, it was objectively reasonable for Appellant to believe SM consented to being bitten.

We are not clearly convinced the finding of guilty is against the weight of the evidence. We find the Government introduced sufficient evidence to prove beyond a reasonable doubt SM did not consent to Appellant biting her hand so hard it caused a large bruise and individual tooth marks that were discernible hours later, or that Appellant reasonably mistakenly believed SM consented to such a bite. Appellant and SM had no history of such consensual behavior. With respect to actual consent, SM testified to her understanding that consensual "rough sex" might include "light slapping" or "hair pulling." SM testified that after she told Appellant he could do what he wanted, he put his hand on her throat in a manner that made it difficult for SM to breathe and was, in fact, not consensual. She told him to "please stop," and in response Appellant intensified the strangling until she lost consciousness. After she awoke, panicked and crying, there was no consensual activity.

As Appellant notes, SM testified she stated during an OSI interview she was unsure if the anal sex was consensual because she "was intoxicated and had spotty memory." However, her testimony indicates the only significant period of time for which she lacked memory was the period of unknown duration from when Appellant strangled her into unconsciousness until he yelled and shook her awake. Her testimony otherwise generally accounts for the events of that night. The evidence does not suggest SM was so intoxicated that she experienced alcohol-induced fragmentary memory blackouts, as Appellant suggests. In addition to her generally coherent testimony regarding periods while

she was conscious, she sent SrA OA text messages from Appellant's bathroom that were articulate and correctly spelled; she successfully drove herself to SrA OA's house, a journey of 30 or 35 minutes; and the police body camera recordings depict her as very distressed, but alert and not otherwise significantly impaired. Accordingly, we find Appellant's suggestion that the biting occurred consensually during an alcohol-induced blackout unpersuasive.

In addition, we are not clearly convinced the statement in the medical report that Appellant bit SM's hand "[w]hen he had one hand on her neck" raises a reasonable doubt as to consent or reasonable mistake of fact. Although SM told the nurse examiner certain sexual activities—prior to the strangling—had been consensual, she photographed the bite mark and reported the bite as part of the nonconsensual abuse Appellant inflicted. Assuming for purposes of analysis Appellant subjectively believed SM consented to the bite—as DW testified Appellant had bitten her on multiple occasions during their relationship—we are not clearly convinced the evidence raises a reasonable doubt as to the objective reasonableness of such a hard bite on an intimate partner with whom he had no prior history of such behavior.

Accordingly, we find the conviction as to Specification 4 of Charge V factually sufficient.

### e. Charge V Specification 2 – Domestic Violence against SM by Strangling her with his Hands[15]

In order to convict Appellant of domestic violence as alleged in Specification 2 of Charge V, the Government was required to prove: (1) Appellant assaulted SM, an intimate parter; (2) Appellant did so by strangulation; and (3) the strangulation was done with unlawful force or violence. *See* 10 U.S.C. § 928b(5); *2024 MCM*, pt. IV, ¶ 78a.b.(6). "Strangulation" means "[i]ntentionally, knowingly, or recklessly impeding the normal breathing or circulation of the blood of a person by applying pressure on the throat or neck, regardless of whether that conduct results in any visible injury or whether there is any intent to kill or protractedly injure the victim." 2024 *MCM*, pt. IV, ¶ 78a.c.(5) (adopting the definition of "strangulation" from 2024 *MCM*, pt. IV, ¶ 77.c.(5)(c)(iii)). Otherwise offensive touching may be non-offensive when done with consent. *See Johnson*, 54 M.J. at 69 (citation omitted).

Appellant does not contest that he strangled SM on the night of 7 June 2022. However, he contends the finding of guilty is factually insufficient because the Government failed to disprove beyond a reasonable doubt that either SM consented to the strangling, or that Appellant had a reasonable mistake of

---

[15] Appellant challenges this finding pursuant to *Grostefon*, 12 M.J. at 435.

fact that SM consented. We find Appellant has made a sufficiently "specific showing of a deficiency of proof" to enable this court to review the factual sufficiency of the finding. *See* 10 U.S.C. § 866(d)(1)(B)(i); *Harvey*, 85 M.J. at 130. However, we are not persuaded by Appellant's arguments.

First, Appellant argues SM's testimony "offered two mutually exclusive accounts of the strangulation incident." On direct examination, as described in the Background section *supra*, SM testified that Appellant began strangling her some period of time after the consensual sex concluded, after Appellant unexpectedly slapped her and he brought up his interest in "rough sex." On cross-examination, SM agreed that during her sexual assault examination she told the nurse, as quoted by trial defense counsel, "We were having sex. At first, it was consensual, only vaginal," followed by, "As you were having vaginal sex, he put his hands on my throat, and it was hard to breathe." However, we do not find this discrepancy materially undermines SM's testimony. Trial defense counsel was clearly referring to the report of the sexual assault examination, which was admitted into evidence as a prosecution exhibit. The report actually quotes SM as having said, in pertinent part:

> [W]e where [sic] having sex. At first it was consensual, only vaginal. He put his hands on my throat and it was hard for me to breath[e], I told him to stop. He said oh you want me to keep doing it and then he put two hands on my throat and was squeezing hard, I passed out and I woke up to him shaking me and screaming at me to wake up. He got mad that I passed out and was crying he was slapping me and pulling my hair. When I woke up my rectum hurts and he took my arm and forced me to shower. . . . He ejaculated in my rectum, I had semen coming from my rectum and he made me wash it in the shower.

This account is far more condensed than SM's direct testimony, but we do not find it meaningfully inconsistent with her testimony. The recorded statement is ambiguous as to whether the strangling occurred during the vaginal intercourse, or at some point thereafter. The general effect of the statement is not that SM engaged in consensual intercourse with Appellant that included consensual strangling, but to distinguish between the initial (vaginal) intercourse, that was consensual, and the later nonconsensual anal intercourse, which occurred after Appellant strangled SM into unconsciousness despite SM telling him to stop.

Appellant additionally cites SM's testimony that she told Appellant he "could do anything [he] wanted" before he began strangling her, testimony from Dr. PT describing how some couples engage in consensual asphyxiation for sexual gratification, and DW's testimony that she consented to Appellant

putting his hands on her neck during sexual intercourse. Appellant contends this evidence supports a conclusion that either SM consented to the strangulation, or that Appellant had a subjectively honest and objectively reasonable mistake of fact that she consented. However, considering the evidence as a whole, for the reasons stated in section II.A.2.*a*, *supra*, we are not clearly convinced the finding of guilty is against the weight of the evidence. Among other considerations, we find significant SM's testimony and prior consistent statements that Appellant refused to stop strangling her when she told him to, her panicked reaction and distraught condition after the incident, and documented evidence of her injuries, including bruises on her neck and burst blood vessels on her neck and face and in her eye.

Accordingly, we find Appellant's conviction as to Specification 2 of Charge V factually sufficient.

### *f. Charge I and its Specification – Wrongfully Communicating a Threat to SM*

In order to convict Appellant of communicating a threat as alleged in the Specification of Charge I, the Government was required to prove that: (1) Appellant communicated certain language expressing a present determination to injure SM, presently or in the future, to wit: "If you do not stop crying, I will hit you," or words to that effect; (2) the communication was made known to SM or to a third person; and (3) the communication was wrongful. *See* 10 U.S.C. § 915; *MCM*, pt. IV, ¶ 53.b.(1). "The communication must be one that a reasonable person would understand as expressing a present determination or intent to wrongfully injure the person, property, or reputation of another person, presently or in the future." *MCM*, pt. IV, ¶ 53.c.(1). "The wrongfulness of the communication relates to the accused's subjective intent. For purposes of this paragraph, the mental state requirement is satisfied if the accused transmitted the communication for the purpose of issuing a threat or with the knowledge that the communication will be viewed as a threat." *MCM*, pt. IV, ¶ 53.c.(2).

Appellant contends the finding of guilty as to wrongfully communicating a threat is factually insufficient because the Government did not introduce evidence Appellant said the words alleged in the specification.[16] Appellant has made a sufficiently "specific showing of a deficiency of proof" to enable this court to review the factual sufficiency of the finding. *See* 10 U.S.C. § 866(d)(1)(B)(i); *Harvey*, 85 M.J. at 130. However, we find the evidence does support the conviction.

---

[16] Appellant does not contest elements (2) or (3) of the offense.

Appellant is correct that the Government did not introduce evidence that matched the specific words quoted in the specification. The court members received two versions of the verbal threats Appellant stated to SM when she could not stop crying after awakening from unconsciousness. First, SM testified that as she sat on the floor crying, Appellant "start[ed] hitting [her] on the left side of [her] face many times and he's telling [her] to stop crying." Trial counsel then asked SM if Appellant said "what will happen if [she] do[es]n't stop crying." SM testified, "[Appellant] said that if I don't stop crying, something along the lines of, like, I'll find out what happens." SM testified that when she did not stop crying, Appellant grabbed her hair and hit her head against the wall "about twice," before hitting her "a few more times on the left side of [her] face" with his hands. In addition, the Government introduced the report of SM's sexual assault medical examination as a prosecution exhibit. In that report, the nurse recorded SM as stating, *inter alia*, "[Appellant] was hitting [her] in the face and pulling [her] hair. [Her] nose started bleeding and [her] throat hurt[ ]. He said if [SM] cried one more time there would be problems for [her]."

The court members found Appellant guilty of the specification as charged, to include the "'If you do not stop crying, I will hit you,' or words to that effect" language, without exceptions or substitutions. Appellant notes that a Court of Criminal Appeals "cannot except or substitute 'language [in] a specification in such a way that creates a broader or different offense than the offense charged at trial.'" *United States v. Patterson*, No. ACM 40426, 2024 CCA LEXIS 399, at *45 (A.F. Ct. Crim. App. 27 Sep. 2024) (unpub. op.), *aff'd*, 86 M.J. 24 (C.A.A.F. 2025) (alteration in original) (quoting *United States v. English*, 79 M.J. 116, 121 (C.A.A.F. 2019)). Therefore, the sufficiency of the evidence turns on whether the words attributed to Appellant that were introduced in evidence are "words to th[e] effect" of the charged quoted language.

Unsurprisingly, the parties disagree on this point. Appellant argues "[t]he words 'you'll find out what happens' and 'there will be problems for you' are materially different from 'I will hit you.' While the first two suggest the possibility of negative repercussions, neither expresses a current conditional intent to inflict violence." The Government makes two arguments in response. First, the Government argues Appellant misrepresents the issue, which according to the Government is actually an issue of "variance" rather than factual sufficiency. In the alternative, the Government argues that if the issue is evaluated as a matter of factual sufficiency, the statements SM attributes to Appellant were, under the circumstances, to the same effect as a threat to hit her if she did not stop crying.

We find it unnecessary to address the Government's argument with respect to "variance." Simply put, sufficiency of the evidence and variance are distinct

issues. *See generally United States v. Lubasky*, 68 M.J. 260, 264–65 (C.A.A.F. 2010) (having found certain convictions legally insufficient, declining to analyze whether the insufficient findings might nevertheless be upheld under a variance analysis where the factfinder did not make findings by exceptions or substitutions). Appellant alleges insufficiency of the evidence; the question before us is whether the evidence sufficiently supports the finding. Appellant has made a sufficiently specific showing regarding a deficiency of proof for us to analyze his factual insufficiency argument. However, we are not clearly convinced the finding is against the weight of the evidence.

We agree with the Government's alternative argument that, under the circumstances, Appellant telling SM that if she did not stop crying she would "find out what happens" or "there w[ould] be problems for [her]" was to the same effect as threatening to hit her. According to SM's testimony, Appellant had already started hitting her in the face as he told her to stop crying. Under the circumstances, Appellant's threat that she would "find out what happens" or that she would have "problems" would reasonably be understood as a threat of continued physical abuse, to include "hitting." Indeed, according to SM's testimony this proved to be the case, as Appellant continued to hit her face when she did not stop crying. Accordingly, we do not find this conviction factually insufficient.

## B. STC's Argument on Findings

### 1. Additional Background

STC's closing argument on findings included the following statements. Appellant takes issue with the italicized portions of the argument. In order to place these comments in the proper context, we quote relevant adjacent portions of the argument.

> *This is not a case like he said, she said.* This is not a situation where . . . people get drunk, something happened, they wake up the next morning, and somebody looks back and says, you know what, whatever happened then, I wouldn't have consented to that if I was sober, so maybe that wasn't consensual. That's not what this is about. This is not a situation when you look at the facts and evidence that we have in this court and we look at and say, you know, reasonable people could disagree of whether any of these three ladies wanted, consented to what was happening to them.
>
> . . . .
>
> [Y]ou have been presented with a mountain of evidence, in-court sworn testimony from all three victims, testimony from a

multitude of other witnesses. You have documentary, photo-graphic, videographic, audio, medical, DNA forensic evidence; and when you look at this evidence, it all has one common thread. It has one simple and terrible explanation, [Appellant]. He got intoxicated, he instilled fear, and he dominated three young women. *Now, in some cases, you may only have the testi-mony of the two people who are in the room; or if the two people in the room are the only people who know what happened, you might only have the testimony of one.* In this case, you don't have to just rely on the testimony of the one person – the one victim in the room because you have a lot more. In many cases, you might not have evidence of them reporting right away, evidence of pictures taken, of reports made, or statements made exactly immediately after it happened. But in this case, we do. *There is undeniable evidence in this case, evidence that the defense cannot deny that has not been refuted in this case,* and we'll go through it one at a time.

STC proceeded to discuss the evidence related to the offenses against SM before turning to AS:

What about [AS]? *Nothing refuted what [AS] said on the stand.* She took the stand, swore an oath to tell the truth, and she told you she was walking doing laundry. The accused made his way into her room. She walked in voluntarily with him. There's no evidence that he grabbed her and yanked her in there. That's not required. But what happened is they went into the room; and once in there, the door shut, alcohol on his breath, he grabs her and shoves her in the corner and shakes her saying "Where is [DW]?" When she tries to leave, he blocks her. He won't let her leave. He calls her a liar that she doesn't know where [DW] is, a liar that she has to go do laundry. He doesn't let her leave for five to ten minutes. He puts his hand on her chest and says "Are you scared?" *This is undeniable. This has not been refuted. There is nothing contradicting [AS's] testimony.*

. . . .

We're going to talk about consent with [DW] too because rape has something called a lesser included offense of sexual assault. And what that means is, as the military judge told you, if you find that even though he penetrated her vulva and her anus, then maybe the force that he used wasn't sufficient to overcome her will. It wasn't sufficient to qualify as unlawful force like we

talked about. Our position is that it did. *I believe the evidence shows that.* But if you find that what he did to her wasn't unlawful force, you can still find that he sexually assaulted her, which is a lesser included offense of the rape charge. And what that means is he penetrated her vulva and penetrated her anus, and he did it without her consent. And consent means a freely given agreement to the conduct at issue by a competent person, and *we know* she didn't freely give agreement to the sex. In fact, *we know* that she actively told him "No, I don't want to have sex with you," and he did it anyway.

. . . .

Now for the ripping of the pants. The elements are that [Appellant] destroyed non-military property, meaning personal property, by willfully and wrongfully ripping a pair of [DW's] black pants in front of her. . . . [A]nd he did so to intimidate her, his intimate partner. . . . Now, there's other elements that go along with that because in order to charge domestic violence in this case, we have to charge kind of a sub-crime that gets looped into that. So there are other elements that are in your instructions and the judge told you about. So those elements are: It requires the pants belonging to [DW], they have to be of some value, and they need to be destroyed; and being destroyed means that they must be sufficiently injured to be useless for their intended purpose. *I think that is what he did.* That's what he did to her pants as he stared at her and then threatened to kill her.

. . . .

[SM] forgot about spending time with [Appellant after 7 June 2022]. . . . She did testify in an earlier hearing that she didn't remember spending that time with him. When she said that, she believed that to be the truth. And do you know how we know that? The way we know that is because those text messages that she reviewed that you heard the defense counsel gave to her so she could look over these things, all these messages that are out there, those messages she gave to OSI. We heard from Agent [PM]. The messages that they got from [SM], she chose to give those to them. She chose to say, hey, here are all the messages I got with – I had with [Appellant]. Do you think if she was trying to hide that fact and lie that she would have just voluntarily given to OSI all of those messages spending time with [Appellant]? She wouldn't have. Those messages that refreshed her

memory and she realized, oh, goodness, when she reviewed it a few days before trial, she realized that wasn't true what I had said to the judge the last time. *So she came in here and she told the truth.* She looked at those messages that she had voluntarily given to OSI, not trying to hide anything, and she said, yes, I was mistaken before. This is what actually happened. She wasn't trying to hide the ball. She was honestly mistaken. . . .

. . . .

The theory of [AS] lying. The only thing that came out about this, I suppose, is that she didn't tell Security Forces right there while he was present with her.[17] I mean, do you think maybe she didn't want Security Forces to know – or she didn't want [Appellant] to know right there that she was ratting on him about what he had just done to her? Now, she told them later, but not right then while he was there with her. That's, I suppose, about it. *I don't know any other explanation of why she would have been lying.* She had no other motive to lie. She's doing her own thing. She's not friends with [DW] anymore. There is no reason for her to come in here and testify about this other than it being true.

. . . .

[S]light changes in memory – even as [DW] here, she didn't remember telling [OSI about the March 2022 incident on the day Appellant left Korea] until she looked at the transcript [of the OSI interview]. So don't let yourself be persuaded that she must be lying simply because there are some things that happened before or she may have said before that she doesn't remember now. That means she is a human being. *She sat here and took an oath and was as honest as she possibly could be with all of us.*

These statements were spread within an argument that lasted approximately 80 minutes and spanned approximately 33 pages of transcript. Trial defense counsel did not object to any of the statements Appellant cites on appeal as error. Over the course of the court-martial, the military judge instructed the court members multiple times, to include shortly before and during STC's closing argument, that the burden to prove guilt beyond a reasonable doubt lay with the Government, and it never shifted to the Defense to prove innocence or disprove an element. The military judge also instructed the

---

[17] AS testified that after Appellant followed her out of her dormitory room, she walked to another area of the dormitory where she encountered on-duty security forces members. AS did not immediately report to them what Appellant had done.

members that Appellant had "an absolute right to remain silent," they were not to draw any adverse inference from the fact Appellant did not testify, and they must disregard the fact Appellant did not testify.

### 2. Law

"We review prosecutorial misconduct and improper argument de novo and where . . . no objection is made, we review for plain error." *United States v. Voorhees*, 79 M.J. 5, 9 (C.A.A.F. 2019) (citing *United States v. Andrews*, 77 M.J. 393, 398 (C.A.A.F. 2018)). "Plain error has occurred when (1) there was an error, (2) the error was clear or obvious, and (3) the error caused material prejudice to a substantial right of the accused." *United States v. Matti*, __ M.J. __, No. 25-0148, 2026 CAAF LEXIS 189, at *9 (C.A.A.F. 17 Feb. 2026) (citing *Voorhees*, 79 M.J. at 9). The appellant bears the burden to demonstrate plain error. *United States v. Knapp*, 73 M.J. 33, 36 (C.A.A.F. 2014) (citation omitted).

"[T]rial counsel may 'argue the evidence of record, as well as all reasonable inferences fairly derived from such evidence.'" *United States v. Halpin*, 71 M.J. 477, 479 (C.A.A.F. 2013) (quoting *United States v. Baer*, 53 M.J. 235, 237 (C.A.A.F. 2000)). "A prosecutorial comment must be examined in light of its context within the entire court-martial." *United States v. Carter*, 61 M.J. 30, 33 (C.A.A.F. 2005) (citation omitted). "[I]t is permissible for trial counsel to comment on the defense's failure to refute government evidence or to support its own claims." *United States v. Paige*, 67 M.J. 442, 448 (C.A.A.F. 2009) (citations omitted). "[T]he Government is permitted to make 'a fair response' to claims made by the defense," even when constitutional rights are at stake. *United States v. Gilley*, 56 M.J. 113, 120 (C.A.A.F. 2001) (citations omitted).

"The Due Process Clause of the Fifth Amendment to the Constitution[18] requires the Government to prove a defendant's guilt beyond a reasonable doubt." *United States v. Czekala*, 42 M.J. 168, 170 (C.A.A.F. 1995) (citing *In re Winship*, 397 U.S. 358, 363–64 (1970)). For trial counsel to suggest the accused has any burden to produce evidence demonstrating his innocence is "an error of constitutional dimension." *United States v. Mason*, 59 M.J. 416, 424 (C.A.A.F. 2004) (citation omitted). "[I]t is black letter law that a trial counsel may not comment directly, indirectly, or by innuendo, on the fact that an accused did not testify in his defense." *Carter*, 61 M.J. at 33 (quoting *United States v. Mobley*, 31 M.J. 273, 279 (C.M.A. 1990)). "Trial counsel may not argue that the prosecution's evidence is unrebutted if the only rebuttal could come from the accused." *Id.* (quoting *Manual for Courts-Martial, United States* (2002 ed.), R.C.M. 919(b), Discussion).

---

[18] U.S. CONST. amend. V.

"'Argument may include comment about the testimony, conduct, motives, interests, and biases of witnesses to the extent supported by the evidence.'" *Matti*, 2026 CAAF LEXIS 189, at *10 (quoting R.C.M. 919, Discussion). However, "improper vouching occurs when the trial counsel 'places the prestige of the [G]overnment behind a witness through personal assurances of the witness's veracity.'" *United States v. Fletcher*, 62 M.J. 175, 180 (quoting *United States v. Necoechea*, 986 F.2d 1273, 1276 (9th Cir. 1993)). "Bolstering" occurs when trial counsel attempts to improperly enhance his or her own credibility. *See Voorhees*, 79 M.J. at 11.

"[T]rial counsel is also prohibited from injecting into argument irrelevant matters, such as personal opinions and facts not in evidence," with the exception of "contemporary history or matters of common knowledge within the community." *United States v. Schroder*, 65 M.J. 49, 58 (C.A.A.F. 2007) (citing *Fletcher*, 62 M.J. at 180); *United States v. Kropf*, 39 M.J. 107, 108 (C.M.A. 1994)) (additional citation omitted). Prohibited personal opinions include "expressing a 'personal belief or opinion as to the truth or falsity of any testimony or evidence.'" *Matti*, 2026 CAAF LEXIS 189, at *15 (quoting *Fletcher*, 62 M.J. at 179) (additional citation omitted).

"When a trial counsel makes an improper argument during findings, 'reversal is warranted only when the trial counsel's comments taken as a whole were so damaging that we cannot be confident that the members convicted the appellant on the basis of the evidence alone.'" *United States v. Norwood*, 81 M.J. 12, 19 (C.A.A.F. 2021) (quoting *Andrews*, 77 M.J. at 401–02). In general, appellate courts "weigh three factors to determine whether trial counsel's improper arguments were prejudicial: '(1) the severity of the misconduct, (2) the measures adopted to cure the misconduct, and (3) the weight of the evidence supporting the conviction.'" *Andrews*, 77 M.J. at 402 (quoting *Fletcher*, 62 M.J. at 184). Where an error is of constitutional dimensions, an appellate court may not affirm the result unless the error was harmless beyond a reasonable doubt. *Mason*, 59 M.J. at 424. This "standard is met where a court is confident that there was no reasonable possibility that the error might have contributed to the conviction." *United States v. Prasad*, 80 M.J. 23, 29 (C.A.A.F. 2020) (citations omitted).

"[T]he lack of a defense objection is 'some measure of the minimal impact of a prosecutor's improper comment.'" *Gilley*, 56 M.J. at 123 (quoting *United States v. Carpenter*, 51 M.J. 393, 397 (C.A.A.F. 1999)). Court members are presumed to follow a military judge's instructions absent evidence to the contrary. *United States v. Taylor*, 53 M.J. 195, 198 (C.A.A.F. 2000) (citations omitted).

### 3. Analysis

Appellant contends STC's closing argument was improper in three general respects: improper commentary on Appellant's failure to testify; improper vouching for witnesses; and improper references to what STC knew or believed. Because trial defense counsel did not object, we review for plain error. *Voorhees*, 79 M.J. at 9. We address each type of error Appellant asserts in turn below.

#### a. Commentary on Appellant's Failure to Testify

#### i) STC's Comments at the Beginning of the Argument

First, Appellant cites STC's statements at the outset of the argument that "This is not a case like he said, she said," followed shortly thereafter by, "[I]n some cases, you may only have the testimony of the two people who are in the room; or if the two people in the room are the only people who know what happened, you might only have the testimony of one." Appellant contends STC was clearly drawing attention to the fact that the victims SM, AS, and DW testified, and Appellant did not. However, viewing these statements in context, we find no "clear or obvious" error. *Knapp*, 73 M.J. at 36 (citation omitted).

With respect to the "he said, she said" comment, in context, STC was not contrasting the victims' testimony with Appellant's failure to testify. Instead, STC was attempting to make the point this was not a case of consensual sexual activity that one of the participants subsequently regretted. With respect to the "people who are in the room" comment, in context, again STC was not highlighting the fact Appellant did not testify. Instead, he was making the point that—at least with respect to SM and DW—the Government offered much more evidence than simply the testimony of the victims, to include "testimony from a multitude of other witnesses[,] . . . documentary, photographic, videographic, audio, medical, [and] DNA forensic evidence . . . ." Accordingly, we find no relief is warranted as to these statements.

As to STC's initial reference to "undeniable evidence in this case, evidence that the defense cannot deny that has not been refuted," Appellant now contends[19] these statements run afoul of the admonition by the United States Court of Appeals for the Armed Forces (CAAF) in *Carter* that trial counsel "may not argue that the prosecution's evidence is unrebutted if the only rebuttal could come from the accused." 61 M.J. at 33 (citation omitted). This statement by STC comes at the end of the same paragraph quoted above describing

---

[19] Appellant's initial assignments of error brief did not allege this quoted language was improper. Appellant argued this language as improper in his subsequent suggestion for reconsideration en banc.

the multiple types of evidence in this case. The preface to this statement was STC telling the members, "In many cases, you might not have evidence of them reporting right away, evidence of pictures taken, of reports made, or statements made exactly immediately after it happened. But in this case, we do." Again, here the STC was not contrasting the victims' in-court testimony describing the offenses themselves with Appellant's failure to testify, where Appellant was the only other person present. Rather, STC was again highlighting the existence of the additional evidence that enhanced the credibility of the victims' testimony. Moreover, "[t]he absence of objection tends to indicate that the defense did not regard the prosecutor's argument as egregiously improper and is a persuasive inducement to an appellate court to evaluate the prosecutor's argument in the same light as the defense probably considered it at the trial." *Matti*, 2026 CAAF LEXIS 189, at *19 (quoting *United States v. Wood*, 40 C.M.R. 3, 5 (C.M.A. 1969)). In context, we are not persuaded it was *clear or obvious* that STC was improperly shifting the burden of proof. *See id.*

However, assuming *arguendo* this comment by STC was clearly or obviously erroneous, we find no reasonable possibility this statement contributed to the convictions. *See Prasad*, 80 M.J. at 29. As described above, STC's argument on findings was relatively lengthy and detailed. The sentence in question was a brief comment in a paragraph focused on the existence of various types of corroborating evidence, rather than contrasting the victims' testimony with Appellant's silence. Accordingly, we find the severity of the error is low. Moreover, the military judge's instruction that the members must disregard that Appellant did not testify, and in particular his repeated instructions that the burden of proof lay exclusively with the Government, provide additional insurance the court members did not misapply STC's statements. Having considered the *Fletcher* factors set forth in *Andrews*, 77 M.J. at 402, as well as the absence of objection and the argument as a whole, we do not find these comments warrant relief. *See Norwood*, 81 M.J. at 19 (citation omitted).

### ii) STC's Comments about AS's Testimony

Next, and more troublesome, are STC's later comments to the effect that AS's testimony in particular was "undeniable," "unrefuted," and that "nothing contradict[ed]" it. Appellant contends these arguments are also improper under *Carter*, 61 M.J. at 33 (citation omitted). As to these statements, we agree. These comments are, in form, similar to STC's comments about undeniable and unrefuted corroborating evidence analyzed above, but the context is significantly different. The only substantial evidence that Appellant assaulted and kidnapped AS on or about 21 June 2021 was the testimony of AS. Appellant was the only other person present. STC made these comments while delivering a summary of AS's testimony, and twice emphasized that nothing refuted AS's testimony. In context, whether intentional or not, STC's argument that AS's

account was "undeniable" because it was unrefuted and uncontradicted drew the members' attention to, and exploited, the fact that Appellant did not testify. Accordingly, we find a clear and obvious error under *Carter*.

The Government argues these comments were not plainly erroneous but a fair response to comments trial defense counsel made in the Defense's opening statement. *See Gilley*, 56 M.J. at 120. The Government cites with emphasis the following from the Defense's opening statement:

> Now, the [G]overnment talked a little bit about this [AS] situation. The situation this one night where it's charged in the specification as kidnapping. Now, this was a drunk, dumb [A]irman looking for his girlfriend that night. Look at the details. Look at your understanding. Look at the common sense and the way of the world. He is looking for his girlfriend. He was drunk. He was acting dumb. But the specification on the charge sheet is kidnapping. I'm not going to go into any more details. *You're going to hear the testimony from the individuals*. You're going to hear kind of what happened that night.

The Government contends trial defense counsel's reference to "hear[ing] the testimony from the individuals" was in effect a promise that Appellant himself would testify, and STC's findings argument regarding AS's testimony was a fair response. We disagree. The statement the Government cites is a far cry from a promise that Appellant will testify, much less that he would contradict AS's testimony. The reference to "testimony from the individuals" can be easily understood as a reference to hearing testimony from AS and DW, both of whom provided some testimony about that night (although DW did not witness the actual charged offenses), or to hearing testimony from witnesses in general over the course of the court-martial. Moreover, the gist of the quoted language is not that AS's account would be untrue or disproved, but that the Government was exaggerating the criminality of a "drunk, dumb Airman" who was only looking for his girlfriend.

We cannot conclude the error was harmless beyond a reasonable doubt. *See Mason*, 59 M.J. at 424. Although the military judge advised the court members that Appellant had an absolute right not to testify, and that the Defense had no burden of proof, we are not convinced the court members would have understood these general instructions required them to disregard STC's improper but unchallenged argument that AS's testimony must be believed because it was unrefuted and uncontradicted. Moreover, although the improper comments may not have been "a centerpiece of the closing argument," as they were in *Carter*, 61 M.J. at 34, constitutional errors may be fatal as to particular findings even if they are not pervasive across an entire argument. AS's

testimony was the only substantial evidence with regard to the 21 June 2021 offenses. Appellant's conviction on these offenses depended on the court members finding her account credible beyond a reasonable doubt. STC's comments shored up what was arguably the greatest weakness with AS's testimony—that it was not corroborated by any other witnesses or physical evidence. Accordingly, we conclude we must set aside the findings of guilty as to Charge III and its Specification and Charge IV and its Specification, and reassess the sentence.

### b. References to STC's Knowledge or Belief

Appellant cites four instances in the portions of the argument quoted above where STC used personal pronouns, stating "I believe," "we know" (twice), and "I think." Appellant characterizes these statements as STC improperly expressing personal opinions about the evidence. Trial counsel are generally prohibited from injecting their personal opinions into argument, and the use of first-person pronouns to comment on evidence can be a dangerous practice. *See Schroder*, 65 M.J. at 58 (citation omitted) (stating trial counsel are prohibited from "injecting" personal opinions); *Fletcher*, 62 M.J. at 180 (citation omitted) ("Improper vouching can include the use of personal pronouns in connection with assertions that a witness was correct or to be believed."). In context, we find STC was not using these phrases to invite the court members to rely on his personal opinion, but to summarize the state of the evidence. Although the form of these statements might have been objectionable, in context we question whether they amounted to clear or obvious error.

Nevertheless, in light of the CAAF's recent reiteration in *Matti* that trial counsel "cannot express opinions about the evidence," 2026 CAAF LEXIS 189, at *16, we will assume for purposes of analysis these first-person comments were clearly and obviously erroneous. However, we conclude they did not unfairly prejudice Appellant. We find the severity of the error very low. In each case, we find STC was essentially commenting on the state of the evidence rather than relying on the prestige or authority of the Government or prosecutor to influence the court members. Moreover, these were fleeting comments in a lengthy closing argument that primarily focused on the evidence in the case. Accordingly, having considered the *Fletcher* factors set forth in *Andrews*, 77 M.J. at 402, as well as the absence of objection and the argument as a whole, we do not find these comments so damaging as to warrant relief. *See Norwood*, 81 M.J. at 19 (citation omitted).

### c. Vouching for Witnesses

Appellant cites three instances from the portions of the argument quoted above in which he asserts STC vouched for the credibility of each of the alleged victims. With respect to SM, Appellant cites STC's statement that SM "came

in here and she told the truth." With respect to DW, Appellant cites STC's statement that DW "sat here and took an oath and was as honest as she possibly could be with all of us." "[I]mproper vouching occurs when the trial counsel 'places the prestige of the [G]overnment behind a witness through personal assurances of the witness's veracity.'" *Fletcher*, 62 M.J. at 180 (citation omitted). Read in isolation, or in other contexts, these statements could be read to imply trial counsel sought to influence the court members by offering personal assurance that the witnesses were truthful. However, reviewing for plain error, in context it is far from clear that is what STC did in these instances. In context, it appears STC was inviting the court members to conclude *from the evidence* that the witnesses were credible. *See Halpin*, 71 M.J. at 479 (citation omitted) (trial counsel may argue "all reasonable inferences fairly derived" from the evidence).

With respect to SM, STC was not addressing the truthfulness of her testimony as a whole. STC was specifically addressing SM's admission that she recognized after the fact that she had mistakenly made false statements during a motions hearing. The "truth" STC was specifically referring to was SM's admission during her trial testimony that she had previously made the false statement and that she had in fact continued to meet and communicate with Appellant for a period of time after the 7 June 2022 incident. Thus, STC was commenting on the fact that SM acknowledged and corrected her prior incorrect testimony, which SM testified to and was a matter of evidence.

Similarly, with respect to DW, STC was not offering a blanket indorsement of the reliability of her testimony. Instead, STC was addressing DW's admission that she had forgotten part of an interview she had with OSI. STC's evident point was that the fact that a witness testifies inaccurately based on a faulty memory does not mean the witness is dishonest.

Nevertheless, although we doubt STC offered personal assurances of truthfulness, given the potentially problematic *form* of STC's argument in these instances we will assume *arguendo* Appellant has met his burden to demonstrate clear or obvious error. Even so, we do not find Appellant was prejudiced by any such error. We again find the severity of the error to be very low. These were brief comments imbedded in arguments focused on particular points of evidence. Moreover, Appellant identifies very few such comments in a lengthy argument generally focused on the evidence. Having again considered the *Fletcher* factors, the absence of objection, and the argument as a whole, we do not find the assumed errors "so damaging that we cannot be confident that the members convicted" Appellant, as to the offenses involving SM and DW, "on the basis of the evidence alone." *Norwood*, 81 M.J. at 19 (citation omitted).

## C. Post-Trial Delay

### 1. Additional Background

The court-martial sentenced Appellant on 28 October 2023. The convening authority issued his decision on action on 4 December 2023, and the military judge entered the judgment on 29 December 2023. The court reporter completed certification of the transcript on 13 February 2024, and certified the record of trial as complete on the same day. The record of trial was mailed to Appellant on 26 April 2024.

This court received the record on 3 May 2024. Appellant subsequently filed nine motions for enlargement of time in which to file his assignments of error, which this court granted over the Government's opposition. On 28 March 2025, Appellant filed a motion to remand the record for correction because a portion of the audio recordings of the proceedings were missing. On 3 April 2025, the Government conceded the omissions and agreed that remand was appropriate in order to correct the record. On 7 April 2025, this court remanded the record for correction.

The record was re-docketed with this court on 18 June 2025 with a certificate of correction signed by the military judge. The certificate explained the record was corrected by, *inter alia*, attaching a portion of the missing audio recording of the court proceedings. However, the certificate explained that despite "exhaustive search efforts" a portion of missing audio recording could not be located, specifically the audio of certain closed pretrial motion hearings. However, certified written transcripts of these hearings are included in the record.

After re-docketing, Appellant requested and was granted one additional enlargement of time before filing his assignments of error on 18 August 2025. The Government filed its answer on 17 September 2025, and Appellant filed his reply brief on 24 September 2025.

This court issued its original opinion in this case on 24 February 2026. *See United States v. Kindred*, No. ACM 40607 (f rev), 2026 CCA LEXIS 87 (A.F. Ct. Crim. App. 24 Feb. 2026) (unpub. op.) (now vacated). On 16 April 2026, in response to a defense request for reconsideration en banc, this court decided to reconsider its opinion. The court received additional filings from the Government and Appellant, filed with the court's permission, on 7 and 12 May 2026, respectively.

At no point did Appellant demand in writing speedy post-trial or appellate review. The record initially consisted of nine volumes, including nearly 1,200 pages of transcript and numerous sealed documents.[20]

### 2. Law

"[C]onvicted servicemembers have a due process right to timely review and appeal of courts-martial convictions." *United States v. Moreno*, 63 M.J. 129, 135 (C.A.A.F. 2006) (citations omitted). In *Moreno*, the CAAF established a presumption of facially unreasonable delay "where the action of the convening authority is not taken within 120 days of the completion of trial," "where the record of trial is not docketed by the [CCA] within thirty days of the convening authority's action," or "where appellate review is not completed and a decision is not rendered within eighteen months of docketing the case before the [CCA]." 63 M.J. at 142. In *United States v. Livak*, this court adapted the *Moreno* standard for cases referred to trial on or after 1 January 2019 and established an aggregated 150-day standard for facially unreasonable delay from sentencing to docketing with the CCA. 80 M.J. 631, 633 (A.F. Ct. Crim. App. 2020).

Where there is a facially unreasonable delay, we examine the four factors set forth in *Barker v. Wingo*, 407 U.S. 514, 530 (1972): "(1) the length of the delay; (2) the reasons for the delay; (3) the appellant's assertion of the right to timely review and appeal; and (4) prejudice [to the appellant]." *Moreno*, 63 M.J. at 135 (citations omitted). The CAAF identified three types of cognizable prejudice for purposes of the right to timely post-trial review: (1) oppressive incarceration; (2) "particularized" anxiety or concern "that is distinguishable from the normal anxiety experienced by prisoners awaiting an appellate decision;" and (3) impairment of the appellant's grounds for appeal or ability to present a defense at a rehearing. *Id.* at 138–40 (citations omitted). Where there is no qualifying prejudice from the delay, there is no due process violation unless the delay is so egregious as to "adversely affect the public's perception of the fairness and integrity of the military justice system." *United States v. Toohey*, 63 M.J. 353, 362 (C.A.A.F. 2006).

Independent of an appellant's due process rights, the CCAs have authority to "provide appropriate relief if [an appellant] demonstrates error or excessive delay in the processing of the court-martial after the judgment was entered . . . ." 10 U.S.C. § 866(d)(2); *see United States v. Valentin-Andino*, 85 M.J. 361, 367 (C.A.A.F. 2025).

We review de novo an appellant's entitlement to relief for post-trial delay. *Livak*, 80 M.J. at 633 (citing *Moreno*, 63 M.J. at 135).

---

[20] Appellate filings have increased the record to ten volumes.

### 3. Analysis

Appellant contends he is entitled to relief for unreasonable post-trial delay. Appellant notes this court originally docketed the record 188 days after sentencing, which exceeds the *Moreno/Livak* standard for facially unreasonable delay by 38 days. However, Appellant contends the pre-docketing delay for purposes of *Moreno* and *Livak* was actually much longer. Appellant asserts a "record of trial that does not include a substantially verbatim recording of the court-martial proceedings is incomplete," citing *United States v. Valentin-Andino*, 83 M.J. 537, 539 (A.F. Ct. Crim. App. 2023). Appellant argues that because the record initially lacked any audio recordings from the arraignment on 25 April 2023 or the pretrial motions hearings on 6 July 2023, until the record was re-docketed with a certificate of correction, "no record of trial was docketed" for purposes of *Moreno* and *Livak* until re-docketing on 18 June 2025. Accordingly, Appellant argues, the period between sentencing and docketing was actually 599 days. Appellant contends this court should award a day-for-day credit for the delay exceeding the 150-day *Moreno/Livak* standard, amounting to 449 days, for a due process violation. Alternatively, Appellant contends this court should award relief for excessive post-trial delay pursuant to Article 66(d)(2), UCMJ, 10 U.S.C. § 866(d)(2), even in the absence of a due process violation.

In response, the Government contends the initial docketing of the record on 3 May 2024 was "docketing" for purposes of *Moreno* and *Livak*. Therefore, the Government contends the relevant period was 188 days, or 38 days beyond the standard for a presumptively reasonable delay. The Government cites *United States v. Donley*, No. ACM 40350 (f rev), 2024 CCA LEXIS 228, at *36 (A.F. Ct. Crim. App. 11 Jun. 2024) (unpub. op.), and *United States v. Gammage*, No. ACM S32731 (f rev), 2023 CCA LEXIS 528, at *5–6 (A.F. Ct. Crim. App. 15 Dec. 2023) (unpub. op.), where this court rejected arguments similar to Appellant's. In *Donley*, this court noted the appellant failed to "direct our attention to any ruling by the CAAF or this court holding that a subsequent remand by the CCA to correct one or more errors in the record effectively extends or reopens the period under consideration for facially unreasonable delay until the corrected record is re-docketed . . . ." *Donley*, unpub. op. at *36. We agree with the Government and our prior opinions in this respect. The record was docketed with this court on 3 May 2024, 188 days after sentencing.

However, this conclusion raises another question. If 3 May 2024 is the relevant docketing date for purposes of the sentencing-to-docketing delay, is it also the relevant docketing date for the 18-month standard for presumptively unreasonable post-docketing appellate delay? Approximately 22 months have elapsed between then and the issuance of this court's original opinion, and over 24 months taking into account our reconsideration, potentially constituting a

separate facially unreasonable delay under *Moreno*. Alternatively, are the 18 months measured only from the most recent docketing by the CCA? Does it depend on the circumstances, such as whether an appellant requested the remand by motion or in an assignment of error, or whether the court ordered it *sua sponte*? Neither party directly addresses this point, and we find little definitive guidance in our precedent. However, as we acknowledged in *Donley*, "neither the CAAF nor this court has held that the specific time standards in *Moreno* are the exclusive means by which an appellant may demonstrate a facially unreasonable delay for due process purposes." Unpub. op. at *36–37 (citing *United States v. Greer*, No. ACM 39806 (f rev), 2022 CCA LEXIS 411, at *15 (A.F. Ct. Crim. App. 18 Jul. 2022) (unpub. op.)). Therefore, depending on the circumstances, a facially unreasonable delay might exist for purposes of an appellant's constitutional due process rights even if the specific *Moreno* timelines are not exceeded. In the circumstances of this case, we find it prudent to assume, without deciding, for purposes of our analysis that the time elapsed between initial docketing and issuance of this opinion constitutes a facially unreasonable delay.

Therefore, we have assessed whether Appellant is entitled to relief for either the pre-docketing delay or the post-docketing delay. Significantly as to both periods of delay, Appellant does not allege cognizable prejudice from any period of delay, and we perceive none. Accordingly, no due process violation exists unless the delay is so egregious it adversely affects public perception of the fairness and integrity of the military justice system. *Toohey*, 63 M.J. at 362.

We find the pre-docketing delay was not so egregious. Significantly, the record of trial was substantial, including nine volumes, nearly 1,200 pages of transcript, and numerous sealed documents. Assembling the record required coordination among three different court reporters. The record does raise questions about certain delays—for example, the reason for the delay between certification of the record on 13 February 2024 and docketing with this court on 3 May 2024 is unclear. However, on the whole, the delay is not so egregious as to impugn the integrity of the military justice system.

We also find the post-docketing delay did not amount to a due process violation. Much of the delay is attributable to the ten enlargements of time Appellant requested, and Appellant's request for reconsideration en banc. The length of this opinion attests to the number and complexity of the offenses and issues presented. Between them, the assignments of error, answer, and reply briefs amount to over 200 pages. To be sure, part of the delay is attributable to the incompleteness of the record. Moreover, it is disappointing that the record of trial was certified as complete when the required audio recordings of the 25 April 2023 arraignment and 6 July 2023 motion hearing were absent, and the recording of the closed portion of that hearing evidently lost entirely.

Nevertheless, viewing the entirety of the circumstances, we do not find *the delay* so egregious as to constitute a due process violation.

We have also considered whether to grant relief for excessive post-trial delay pursuant to Article 66(d)(2), UCMJ, independent of any due process violation. Having carefully considered the post-trial processing as a whole, we conclude such relief is not warranted.

## D. Sentence Reassessment

Having set aside the findings of guilty as to Charges III and IV and their specifications, alleging kidnapping of AS and assault consummated by a battery of AS, respectively, we have considered whether we can reliably reassess Appellant's sentence in light of the factors identified in *United States v. Winckelmann*, 73 M.J. 11, 15–16 (C.A.A.F. 2013). We find that we can. In this case, each of the factors weighs in favor of reassessment: the penalty landscape has not dramatically changed; Appellant elected to be sentenced by the military judge; the remaining offenses capture the gravamen of the criminal misconduct; and the remaining offenses are of a type the judges on this court are familiar with. *See id.* In addition, our task is greatly simplified by the segmented sentencing as to confinement the military judge applied. The military judge imposed three months of confinement each for the Specification of Charge III and the Specification of Charge IV, to run concurrent with each other and consecutive to the convictions involving SM and DW. The military judge sentenced Appellant to a total of 20 years of confinement for the offenses involving SM and DW. We are confident the military judge would have imposed the remaining elements of the sentence—including forfeiture of all pay and allowances, reduction to the grade of E-1, and the mandatory dishonorable discharge—even without Charges III and IV and their specifications. Accordingly, we reassess Appellant's sentence to a dishonorable discharge, confinement for 20 years, forfeiture of all pay and allowances, and reduction to the grade of E-1.

## III. Conclusion

The findings of guilty as to Charge III and its Specification and Charge IV and its Specification are **SET ASIDE**. Charge III and its Specification and Charge IV and its Specification are **DISMISSED**. We reassess the sentence to a dishonorable discharge, confinement for 20 years, forfeiture of all pay and allowances, and reduction to the grade of E-1. The remaining findings, as entered, are correct in law and fact. Article 66(d), UCMJ, 10 U.S.C. § 866(d) (2024 *MCM*). In addition, the sentence, as reassessed, is correct in law and fact, and no error materially prejudicial to the substantial rights of Appellant occurred. Articles 59(a) and 66(d), UCMJ, 10 U.S.C. §§ 859(a), 866(d). Accordingly, the remaining findings of guilty (Charge I and its Specification; Charge II and its

Specifications 2, 3, and 4; Charge V and its Specifications 2, 4, 5, 6, 8, and 9; and Charge VI and its Specification 2) and the sentence, as reassessed, are **AFFIRMED**.

FOR THE COURT

CAROL K. JOYCE
Clerk of the Court